PATTERSON, J. (dissenting.)
I am not able to agree with the views expressed in the opinion of the court in this cause, nor in the conclusion at which Mr. Justice INGRAHAM has arrived in his concurring opinion. It is conceded that the equities are overwhelmingly with the plaintiffs, but it is considered that the court is powerless to grant relief, by reason of supposed insurmountable obstacles in fixed rules of law applying to the contract relations existing between the parties. In my judgment, not only do those alleged obstacles not exist, but the intrinsic merits of the plaintiffs' cause being so clear and indisputable, an efficient remedy may be afforded within and pursuant to well-established .elementary principles of equity, with violating or ignoring any rule of law or of evidence, and without the arbitrary exercise of judicial authority. We have before us a plain case of a grievous, *68 contemplated, and threatened wrong, imposing upon the court á plain duty, one which it should be eager to discharge, and not astute to evade, namely, to grant that measure of relief which the plaintiffs’ rights demand, and to withhold which, it seems to me, is purely and simply a denial of justice.
Many, but not all, the material facts, are mentioned in the prevailing opinion ; but no reference is made to the exact situation of the parties, nor to the leonine characted of the contract made by the defendants’ testator with the plaintiffs. Mr. Garry, desiring to retire from any active connection with the business owned by him, proposed to put it absolutely in the charge of his two clerks, the plaintiffs, for them to conduct without any participation by him; they to devote their whole time and to mortgage their future for his benefit; he to retain absolute ownership of the business; they to withdraw from it only such weekly sums as were equal to the wages theretofore paid them; they to advance every dollar of necessary cash capital,—that is to say, each to advance $4,000 (and the evidence shows that the indebtedness of the business never, during any period of its currency, was greater than between $5,000 and $8,000); he (Garry) to receive, from the profits of the business made for him by the labor and the capital of these plaintiffs, the sum of $151.000, with interest at six per cent.; and, when that sum was paid him, the plaintiffs were to acquire, as their reward, each a one-fifth interest in the business, Garry still retaining three-fifths of the whole. Those are facts in the case which should be made prominent. Garry was to secure to himself every dollar he had'in the business, real or imaginary, was to be the absolute owner, was to take no part in conducting it, to do no work, but to leave everything to the fidelity, the diligence and the business skill of his two clerks; and all that they had to look forward to, after Garry was satisfied in full, was the acquisition of a small fractional proprietorship in the business, which would give them a standing, and open to them, possibly, a business career. They were willing to enter into this contract in the hope and expectation referred to, and they were also willing to stipulate that Mr. Garry might, at any time before the full sum of $151,000 and interest at 6 per cent, was' paid to him, from profits to be earned by them, terminate the agreement, and resume possession of the business, by returning to them their capital. This they were willing to do, obviously, because they not only, trusted to the integrity, the sense of justice, and the gratitude of' Garry, but because it is patent that it could not be to his interest to put an end to a contract so immensely beneficial to himself, so' long as they faithfully carried out their part of it by paying to him, from profits, the whole value of his business, and leaving: him, when that was done, the lion’s share of what remained.
When the preliminaries of this contract had been settled, and' the parties met to execute a written>agreement, at the office of the-attorney who prepared it, the plaintiffs found that there had been-inserted therein a provision (that referred to in the opinion of the court), namely, that not only'should the contract be determinable at the pleasure of Mr. Garry, but also at the mere pleasure of his *69 executors, administrators or assigns, upon a return of the capital contributed by the plaintiffs. It is stated in the opinion of the court that this provision was objected to by the plaintiffs. It was not only objected to, but, according to the testimony of Mr. Banning, one of the executors of Mr. Garry, it was protested against, by the plaintiffs. I do not read the testimony as the majority of the court 'have done. Mr. Banning distinctly swears there was a protest against signing with such provision. “Mr. Molohan [he says] made it before the reading was completed. That is my recollection. Mr. Molohan made a protest. Molohan said to Garry: ‘ You are liable to die. What would your-executors do? What position would it place us in if we would sign this? ’ ” Manifestly, they would not be guilty of the folly of committing themselves to this contract, and expending years, perhaps, of faithful labor, with the use of their money, only to find themselves thrown back upon the world at the volition or caprice of strangers, and just at a time, perhaps, when their contract would be upon the eve of fulfillment. There is no doubt that Mr. Garry recognized the reasonableness and the justice of this protest, and thereupon stated that he would make a codicil to his will directing his executors to conform to the agreement; that is, if they (the plaintiffs) conformed to the agreement, to continue the business until the amount was paid, and that the contract would be fulfilled. Thereupon the plaintiffs, as Mr. Banning says, stated that, “ with that understanding, they would sign it; ” and they did sign it, and thus they executed and delivered the contract, upon the distinct understanding and agreement that Garry would do as he promised. 'Their act in so signing and delivering was a consideration for the promise Garry made. There is nothing ambiguous or vague in this part of the transaction. It was a distinct stipulation between the parties that in one certain event or contingency, and only in that one event or contingency, should any limitation be put upon the right to rescind the contract. And this brings us to the consideration of the question as to the legal effect of this particular feature of the transaction. _ o
It would appear that the learned judge at special term admitted all the testimony respecting the protest of the plaintiffs, and the statement and promise made by Mr. Garry to overcome it. That testimony was all objected to, and, if the objections were valid and the testimony were inadmissible, it would be folly to base any judgment upon it. But, in my opinion, that testimony was entirely competent. It was not introduced for the purpose of varying or modifying a written contract between the parties, which was to contain or might have contained all the terms and conditions of all that was in negotiation prior to the execution of the written paper. It was merely a collateral agreement, respecting, 'it is true, a matter in one sense germane to the whole transaction, but actually something that was distinct and separate, and intended to be kept separate, from that which was to be comprehended in the main agreement. The case does not fall within the ruling in Eighmie v. Taylor, 98 N. Y. 288, and Thomas v. Scutt, 127 id. 133; 38 St. Rep. 692, and cognate cases, for the evidence does *70 not affect a paper designed to signify and to execute the'terms of the whole contract agreed upon between the parties, and which was adequate for the purpose of embracing all that was agreed upon. This proof was not intended to import into a written contract a term, which should have been inserted therein, and the case differs toto ¿telo from those relied upon to exclude the testimony.
There are three elements, each one of radical difference: First. By specific agreement between the parties, the stipulation was not to be inserted in the main agreement, but was to be absolutely independent and collateral. Second. In the very nature of things, it could not have been inserted in the agreement, because it was something that was to be done by Mr. Garry by last will and testament or codicil thereto. It was to be done by an instrument to be executed by Mr. Garry alone, and which no one but himself could execute; and it was not contemplated in any way that any reference should be made in the written agreement then signed, to such a codicil. Third. It appears without dispute that Mr. Garry, in conformity with this collateral agreement, did actually execute a testamentary paper of the character he promised to execute as a condition of the plaintiffs’ signing and delivering the contract to him. So that the evidence of the collateral contract was complete. Its terms were definite, and what was intended by Mr. Garry as performance thereof was actually made. I think, therefore, it is clear from the circumstances which surrounded the execution of the agreement, and all the attending facts, and the positive testimony of Mr. Banning, that the matter with reference to the direction to be given to the ex-' eeutors in case Mr. Garry should die before full performance of the contract by the plaintiffs was a thing it was neither contemplated nor intended should go into the main agreement, but should be kept as a matter extrinsic and entirely independent of the terms of that agreement.^
If the foregoing views on this subject are correct, then it will not be dispute0d that it was incompetent for Mr. Garry to revoke or destroy the codicil.' While the provisions of that codicil are not as, broad nor as beneficial to the plaintiffs as their agreement justified them in expecting, yet, doubtless, it evinced Mr. Garry’s apprehension of what had been agreed to, and would be the measure of the plaintiff’s rights. The parol evidence is that Garry stated that his will would contain a direction to his executors to. conform to the agreement so long as the plaintiffs conformed to it. This is referred to in the opinion of the majority of the court, and it is suggested that there is no meaning of any definite character to be ascribed to these words. But Mr. Garry ascribed a meaning,, to them, and that is to be found at folio 169 of the case; and it is that, if the plaintiffs conform to the agreement, the business was. to be continued until the amount was paid (referring to_ the1 $151,000), and that the contract would be fulfilled. There is no. misunderstanding possible of this testimony. It comes from an executor of Mr. Garry’s will, a man who was present at the time the papers were executed and the collateral agreement was made *71 and Garry perfectly understood that, in the event of his death, so long- as the plaintiffs performed their part of the contract, the business was to be continued.
Of course, equity will not undertake to enforce a contract indefinite and uncertain in its character; but what could be more definite and certain than this testimony of the executor of Mr. Garry’s own will, who was a witness to all that took place between the plaintiffs and Mr. Garry ? Mr. Garry’s own understanding of the matter appears from the codicil to his will dated May 24, 1892; and here it is impsrtant to observe that this codicil was executed just ten days after the main agreement was signed and delivered, and must have been for the purpose of carrying out the collateral contract, and of making that independant instrument which he promised to make as a condition of the plaintiffs’ signing the agreement of May 14, 1892. This codicil states that the testator wishes and desires the business established, etc., to be continued “ while the same can be conducted successfully and with profit to my estate; and I desire my said executors shall permit my friends -John Francis Mahar and Patrick Molohan, or any partner or partners I may have at my decease, to have the management and control of my said business as long as, in the discretion of my said executors, they manage the satne profitably.” Now, this, of oourse, is not as broad as the agreement testified to by Mr. Banning; and yet, at the same time, it shows that Mr. Garry’s understanding of the plaintiffs’ conforming to the agreement as testified to by Mr. Banning was so long as the same was managed profitably. This codicil clearly expresses the purpose and desire of the testator that the business shall be continued so long as it could be profitably done; and the discretion which is given to the executors is not the discretion to terminate at any time or under any circumstances, but the business is to be continued so long as it is successful, and produces profit for the estate,—that is to say, profit directly from the business. It is not a general discretion, as Mr. •Justice INGRAHAM, in his opinion, construes it to be. These •executors do not set up in their answer that the business has been managed unprofitably. They do not allege any want of fidelity on the part of the plaintiffs, or any dissatisfaction with their conduct of the business, which they, assuredly, could not have done in view of tne enormous returns of clear profit made to Mr. Garry in his lifetime, and to them since his death. They have therefore no reason or ground to ’complaint of the management, nor to exeroise a discretion adversely to the continuance of the business.
It seems to me, therefore, that the case should stand precisely as if the promised codicil were now in operation; and that the plaintiffs have the right to revoke it as a shield against the termination of the agreement by the executors; and that they have a right to come into a court of equity, arid say that they have performed their contract honestly and faithfully, and to the great profit and advantage of Mr. Garry and of his estate, and to seek the protection of the court from the cruel wrong which these executors are seeking to inflict upon them, under the color of teclmi *72 cal _ rights, which Mr. Garry expressly contracted against, and which justice and equity demand should not be enforced.
I think that the judgment should be reversed, and, on the whole case, a judgment should be directed for the plaintiffs, granting an injunction restraining the defendants from interfering or molesting them in the conduct of the business so long as the same is_conducted profitably.